## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID HOVASSE, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>NEUROTROPE, INC., SUSANNE WILKE, DANIEL ALKON AND CHARLES S. RAMAT,<br><br>       Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Hovasse ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Neurotrope, Inc. ("Neurotrope" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Neurotrope securities between January 7, 2016, and April 28, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Neurotrope is a clinical stage biopharmaceutical company specializing in the development of therapeutics to treat neurodegenerative diseases, including Alzheimer's disease ("Alzheimer" or "AD").

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material information concerning the efficacy of its lead product candidate, Bryostatin-1. As a result of the foregoing, Defendants' statements about Neurotrope's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

4.      After reporting purportedly positive results from the Phase 1 and 2a clinical trials, Neurotrope initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability and efficacy of Bryostatin in the treatment of moderately severe to severe patients with Alzheimer's on January 7, 2016. The Phase 2b trial enrolled 147 patients in a randomized, double-blinded, placebo-controlled study and tested Bryostatin at two doses: 20 microgram and 40 microgram.

5.     The primary efficacy endpoint of the trial was the Severe Impairment Battery ("SIB") and the secondary efficacy endpoints were the Mini Mental State Exam ("MMSE"), Activity of Daily Living ("ADL") and Neuropsychiatric Inventory scale ("NPI").

6.     Patient enrollment was completed on November 22, 2016. When a clinical trial is fully enrolled, this means every potential patient has been treated and the data is thereafter collected and analyzed. Since the beginning of the Class Period, Neurotrope and certain of its officers and directors have misrepresented the efficacy of Bryostatin. For example, Neurotrope has made materially false and misleading statements including, among others:

• That "Neurotrope is at the forefront of developing a novel therapy to treat and potentially reverse moderate to severe Alzheimer's dementia and other neurodegenerative diseases. The Company's world-class science is a paradigm shifting approach that treats some of the underlying causes of Alzheimer's disease;"

• That Neurotrope "may have a breakthrough in Alzheimer's disease and other neurological disorders;" and that

• Neurotrope is "pretty excited about our upcoming Phase II topline data in April 2017 . . . which we believe will be a pivotal inflection point -- valuation inflection point -- for the company;"

7.     On May 1, 2017, Neurotrope issued a press release announcing "positive top-line results" of the pivotal Phase 2b trials of Bryostatin. Defendant Daniel Alkon, Neurotrope's President and Chief Scientific Officer, characterized the results as showing "improvement in patients with moderate to severe Alzheimer's disease." However, the underlying trial data flatly contradicted Neurotrope's representations of the results as positive. First, Neurotrope misleadingly omitted any statement pertaining to the efficacy of the 40 microgram dose with regard to either the primary or secondary endpoints. Moreover, the top-line data relating to 20 microgram dose of Bryostatin failed to produce results that were statistically significant.

8.      On this news, Neurotrope's share price fell $11.84, or 62.95%, to close at $6.97 on May 1, 2017, on heavy trading volume.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Neurotrope's principal executive offices are located within this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff, as set forth in the attached Certification, acquired Neurotrope securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.     Defendant Neurotrope is incorporated in Delaware, with principal executive offices located at 205 East 42nd Street, 16th Floor, New York, New York 10017. During the Class Period the Company's common stock traded on the OTCQB ("OTC") and NasdaqCM ("NASDAQ") markets under the symbol, "NTRP." NTRP shares currently trade on the NASDAQ.

13.     Defendant Susanne Wilke ("Wilke") has served as the Company's Chief Executive Officer ("CEO") since September 2016 and as a member of the Company's Board of Directors since February 2016.

14.     Defendant Daniel Alkon, ("Alkon") co-founded and has served as the Company's President since September 16, 2016. Alkon has served as the Company's Chief Scientific Officer since August 2013.

15.     Defendant Charles S. Ramat ("Ramat") served as the Company's President and CEO from September 12, 2014 to September 23, 2016.

16.     Defendants in ¶¶13-15 are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Neurotrope is a clinical stage biopharmaceutical company specializing in the development of therapeutics to treat neurodegenerative diseases, including Alzheimer's disease.

18.     The Company's most advanced product candidate during the Class Period was Bryostatin, which purportedly works through synaptic growth factors as well as anti-amyloid and anti-tangle signaling pathways in the brain, was designed to induce the growth of mature synapses in the brain and prevent neuronal death.

19.     Prior to the Class Period, the Company had completed its Phase 1 and 2a studies evaluating the primary endpoint of demonstrating preliminary safety and tolerability of Bryostatin. Neurotrope announced the results of its Phase 2a clinical study of Bryostatin in a March 17, 2015 press release entitled "Neurotrope Announces Positive Final Results From Its Phase 2a Safety Study for the treatment of Alzheimer's Disease."

20.     The press release announcing the purportedly positive phase 2a results stated in relevant part:

**Newark, NJ, March 17, 2015** -Neurotrope, Inc. (OTCQB:NTRP) today announced secondary and exploratory endpoint results from its randomized, double-blind, placebo-controlled, single dose Phase 2a clinical trial evaluating bryostatin-1 for the treatment of Alzheimer's disease (AD). Bryostatin is a potent modulator of an enzyme called protein kinase C epsilon (PKCe). The Company is approaching the treatment of Alzheimer's disease through the activation of PKCe. In animal models of Alzheimer's disease, activation of PKCe has been shown to improve learning and memory, induce synaptogenesis or growth of new synapses and prevent neurodegeneration.

*Final analysis of this Phase 2a safety study, in nine Alzheimer's patients with mild dementia as measured by MMSE-2 scores, confirms the previously announced result. The study has met its primary endpoint demonstrating preliminary safety and tolerability of bryostatin. No safety signals have been identified.*

*As a secondary objective, the Phase 2a safety study examined the correlation of the changes in PKCe with plasma levels of bryostatin after a single dose. Preliminary assessment of PKCe levels in peripheral monocytes demonstrated a significant increase in total PKC protein levels at the end of the bryostatin infusion consistent with target engagement.*

Commenting on the study results, Charles S. Ramat, President and Chief Executive Officer of Neurotrope, Inc., said, "We are pleased to confirm the preliminary findings of the Phase 2astudy we disclosed last month, the Phase 2a met its primary endpoint, showing good safety and tolerability. Now we can add that we achieved expected outcomes on the exploratory endpoint of PKCe activation. While we continue to recognize that this is a small trial population we are still greatly encouraged and intend to move this treatment forward to our next planned clinical trial."

An additional secondary objective of the study was the evaluation of efficacy following a single dose of bryostatin. As expected with a single dose of bryostatin, there was no measurable improvement in cognition in this mildly impaired patient population. It is important to note that in previous animal studies improvement of learning and memory was first observed following multiple doses of bryostatin.

Warren W. Wasiewski, MD, Executive Vice President and Chief Medical Officer of Neurotrope, noted, "Given these additional encouraging results, we are actively planning our Phase 2b, multi-site, double-blind, placebo controlled trial of approximately 150 patients in moderately severe to severe AD patients."

(Emphasis added.)

21.    Based on these results, the Company initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability and efficacy of Bryostatin in the treatment of moderately severe to severe patients with Alzheimer's. The Phase 2b trial enrolled 147 patients in a randomized, double-blinded, placebo-controlled study and tested Bryostatin at two doses: 20 microgram and 40 microgram.

## Materially False and Misleading Statements Issued During the Class Period

22.    The Class Period begins on January 7, 2016, when Neurotrope issued a press release announcing that the Company was initiating its Phase 2b trial of Bryostatin, stating in relevant part:

NEWARK, N.J., Jan. 07, 2016 (GLOBE NEWSWIRE) -- Neurotrope, Inc. (OTCBB:NTRP) today announced the initiation of a Phase 2b clinical trial of lead candidate Bryostatin 1 for the treatment of Alzheimer's Disease.

The Phase 2b trial is a randomized, double-blind, placebo-controlled study designed to evaluate the safety, tolerability and efficacy of Bryostatin 1 in the treatment of moderately severe to severe Alzheimer's Disease. The study, which plans to enroll 150 patients, is currently recruiting subjects at five trial sites in Florida, New Jersey, New York and Ohio. Neurotrope is engaging additional sites for the trial with a goal of over 30 participating sites.

"The initiation of this Phase 2b trial is an important milestone for Neurotrope and our lead compound, Bryostatin-1," said Charles Ramat, President and CEO of Neurotrope. "In a Phase 2a study, Bryostatin proved to be safe and well-tolerated,

and demonstrated activation of the PKC epsilon target, which Neurotrope believes results in a cascade effect resulting in synaptogenesis. Damaged synapses are a hallmark of Alzheimer's Disease. ***We believe that Bryostatin represents a potential breakthrough in the treatment of this debilitating disease, and look forward to further evaluating its clinical validity in this study."***

The clinical trial will evaluate two different doses of Bryostatin (20 or 40μg) versus placebo, with a total of seven doses administered over 12 weeks . . .The primary efficacy endpoint is based on Severe Impairment Battery (SIB) Scale, a benchmark assessment used extensively in severe Alzheimer's drug trials. Secondary efficacy endpoints include Activities of Daily Living (ADL), Neuropsychiatric Inventory (NPI) and Mini-Mental State Exam (MMSE).

(Emphasis added.)

23.    On February 11, 2016, the Company announced that the first patient had been dosed with Bryostatin. In the announcement Defendant Ramat stated that: ***"We believe that Bryostatin represents a new and disruptive technology in what has been an unsuccessful war against Alzheimer's disease . . . . We are excited at being on the cusp of providing a meaningful treatment to this suffering, severely impaired population and their caregivers."***

(Emphasis added.)

24.    On November 22, 2016, Neurotrope issued a press release announcing that the Company had completed enrollment for its first Phase 2b trial of Bryostatin. In the press release, Defendant Wilke touted the efficacy and outlook of Bryostatin. In relevant part, Defendant Wilke stated:

"Bryostatin's multi-modal mechanism of action not only targets the neuronal deficits of AD but also synaptic deficits. This combined mechanism of action through PKC epsilon activation gave the Company the confidence to commit to these trials in moderate to severe patients . . . ***We believe that we may have a breakthrough in Alzheimer's disease and other neurological disorders. With the recently completed financing, we believe that we are in a strong position to negotiate terms with pharmaceutical partners."***

(Emphasis added.)

25.     On December 16, 2016, Neurotrope filed a Form S-1 Registration Statement with the SEC in connection with the issuance of securities under the Securities Act of 1933, which were signed and certified by the Company's Directors, including Defendant Wilke. Throughout the Form S-1, the Company reaffirmed the previous statements.

26.     On February 13, 2015, Defendants Wilke and Alkon presented at the 2017 BIO CEO & Investor Conference (the "Conference") at the Waldorf Astoria Hotel in New York, New York. At the Conference, Defendant Wilke spoke regarding the Phase 2b trial as well as about the resulting top-line data. Specifically, Wilke stated, in pertinent part that:

> "We are pretty excited about our upcoming Phase 2 top-line data in April 2017, as I said in moderate to severe Alzheimer's patients, which we believe will be a pivotal inflection point -- *valuation inflection point* -- for the Company . . . . We have extensive preclinical data, clinical data, and compassionate use data that leads us to believe that our mechanism of action can be very effective in reversing Alzheimer's disease."

(Emphasis added.)

27.     On February 28, 2017, Neurotrope issued a press release announcing that the Company completed dosing and patient monitoring for its second Phase 2b trial of Bryostatin. The press release stated in relevant part:

> **NEW YORK, February 28, 2017 /PRNewswire/ -- Neurotrope, Inc. (OTCQB: NTRP),** a clinical-stage biopharmaceutical company developing novel therapies for neurodegenerative diseases, including Alzheimer's disease, announced the conclusion of dosing and patient monitoring in its Phase 2 double blind, placebo controlled clinical trial of bryostatin-1 in the treatment of moderate to severe Alzheimer's dementia. Patients underwent a 12 week treatment with bryostatin-1, followed by a 30-day post-treatment evaluation. The study is designed to assess the therapeutic efficacy of bryostatin-1, a PKC epsilon activator. Prior animal studies have demonstrated bryostatin's efficacy for restorative synaptogenesis, prevention of neuronal death, and anti-amyloid, anti-tau metabolism via the activation of PKC epsilon. *"We are very pleased with the execution of the study. It took only about 13 months from initiation of randomization of the study to completion the last patient visit," Dr. Susanne Wilke, Chief Executive Officer of Neurotrope stated.*

> *"The multi-modal efficacy of bryostatin-1 was extensively studied in both animal models and Expanded Access patients with advanced Alzheimer's dementia. We believe that these studies demonstrated bryostatin's potential to actually improve cognitive functions, not simply slow the rate of cognitive decline," stated Dr. Daniel Alkon, President and Chief Scientific Officer of Neurotrope.* "A reversal of Alzheimer's progression would represent a major step forward in the treatment of Alzheimer's dementia patients after years of failed previous trials by other companies and institutions that predominantly targeted amyloid plaque or tau neurofibrillary tangles. Those trials, thus far, have not achieved a significantly reduced rate of decline or improved cognition in any group of patients diagnosed with Alzheimer's dementia, mild, moderate, or severe," stated Dr.Wilke."
>
> Although the pathologic hallmarks of Alzheimer's disease, extracellular plaques and intracellular tangles at autopsy, are essential to identify those demented patients who had Alzheimer's dementia, plaques and tangles are not closely related to functional decline. In contrast, the loss of synaptic networks has been found, with numerous autopsy studies, to correlate with the severity of cognitive dysfunction and disease progression," stated Dr. Alkon. "We, at Neurotrope, believe that the regenerative effects of bryostatin's treatment on the synapses, as well as bryostatin's prevention of amyloid and plaque deposition, may not just reduce, but potentially reverse the symptoms, by addressing for the first time many of the major early causes of this devastating disease."

(Emphasis added.)

28.    On March 10, 2017, Neurotrope filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ending December 31, 2016, ("2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendant Wilke. Throughout the 2016 10-K the company reaffirmed the previous statements.

29.    On March 24, 2017, Neurotrope issued a press release announcing the that Defendant Alkon would present at the Sachs Associates' 2nd Neuroscience Biopartnering and Investment forum held at the New York Academy of Sciences in New York, New York. In the press release, Defendant Alkon affirmatively touted Bryostatin's efficacy, stating that:

> "Bryostatin-1 *has demonstrated* the potential to prevent neuronal death as well as the well-known brain pathologies, amyloid plaques and neurofibrillary tangles. *Bryostatin's multiple efficacies*, collectively provide an unprecedented opportunity to treat neurodegeneration with a regenerative medicine approach.

The Neuroscience Biopartnering & Investment Forum provides a great opportunity to discuss the exciting advances being made in the science of neurodegenerative diseases, promising treatments under development, and bryostatin's position in the arena."

(Emphasis added.)

30.     Similar overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Class Period. As investors would soon realize, however, these statements were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

31.     The above statements identified in ¶¶22-30 were materially false and/or misleading, as well as failed to disclose material information concerning the efficacy of its lead product candidate, Bryostatin-1. As a result of the foregoing, Defendants' statements about Neurotrope's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**<u>The Truth Emerges</u>**

32.     On May 1, 2017, Neurotrope issued a deceptive press release entitled "NEUROTROPE Announces Positive Top-Line Results from Phase 2 Study of Bryostatin-1 for Moderate to Severe Alzheimer's Disease." The report purported to assert that the results of the Phase 2b trial were significant with regard to Bryostatin's efficacy in treating patients with moderate to severe Alzheimer's disease. The press release stated in relevant part:

>     ***"Neurotrope, Inc. (NASDAQ: NTRP) today announced positive top-line results from its Phase 2 study (-202 Study) of Bryostatin-1 in patients with moderate to severe Alzheimer's disease (AD),*** a population not commonly targeted in AD clinical trials. Bryostatin-1, a Protein Kinase C epsilon activator that works through synaptic growth factors, as well as anti-amyloid and anti-tangle signaling pathways in the brain, has been shown, in non-clinical efficacy studies, to induce the growth of mature synapses in the brain and prevent neuronal death. Thus, Bryostatin-1 has a fundamentally different biological mechanism of action with

the potential for longer lasting effects than the other currently marketed drugs for AD (e.g., donepezil (Aricept®) and memantine (Namenda®)).

This Phase 2 study was the first repeat dose study of Bryostatin-1 in patients with late stage AD (defined as a Mini Mental State Exam 2 (MMSE-2) of 4-15), *in which two dose levels of Bryostatin-1 were compared with placebo to assess safety and preliminary efficacy (p < 0.1, one-tailed) after 12 weeks of treatment.* The pre-specified primary endpoint, the Severe Impairment Battery (SIB) (used to evaluate cognition in severe dementia), compared each dose of Bryostatin-1 with placebo at Week 13 in two sets of patients: 1) the modified intentto-treat (mITT) population (consisting of all patients who received study drug and had at least one efficacy/safety evaluation), and 2) the Completer population (consisting of those patients within the mITT population who completed the 13- week assessment).

Top-line results indicate that the 20 µg dose, administered every two weeks, met the pre-specified primary endpoint in the Completer population, but not in the mITT population. Among the patients who completed the protocol (n = 113), the patients on the 20 µg dose at 13 weeks showed a mean increase on the SIB of 1.5 vs. a decrease in the placebo group of -1.1 (improvement of 2.6) (p < 0.07) (n = 80), whereas, in the mITT population, the 20 mcg group had a mean increase on the SIB of 1.2 vs. a decrease in the placebo group of -0.8 (improvement of 2.0) (p < 0.134) (n = 90).

A total of 147 patients were enrolled into the study; 135 patients in the mITT population and 113 in the Completer population. The Alzheimer Disease Cooperative Study Activities of Daily Living Inventory Severe Impairment version (ADCS-ADL-SIV) was a secondary endpoint. The p values for the comparisons between 20 µg and placebo for the ADCS-ADL endpoint were 0.082 and 0.104, respectively, among the patients who completed the protocol in the mITT population. Analysis of secondary and numerous additional exploratory endpoints are ongoing.

Together these results indicate, in this relatively small trial, that Bryostatin-1, at the 20 µg dose, improved outcomes in important dimensions that are impaired in patients with moderate to severe Alzheimer's disease i.e., cognition and the ability to care for oneself. Since most of the patients in this study were already taking donepezil and/or memantine, the efficacy of Bryostatin-1 was in addition to standard of care.

The safety profile of Bryostatin-1 20 µg was similar to that of the placebo group except for a somewhat higher incidence of diarrhea. Fewer adverse events were reported in patients in the 20 µg group, compared to the 40 µg group. The mean age of patients in the study was 72 years and similar across all three treatment groups.

'The results of this relatively small randomized, double-blind, placebo controlled study of Bryostatin-1 shows that Bryostatin-1 has the potential to positively impact the lives of these severely debilitated patients with moderate to severe AD, a population that is in dire need of new therapies, especially drugs with a new mechanism of action,' said Dr. Susanne Wilke, Neurotrope's Chief Executive Officer. 'We are excited to take the next steps in advancing the development of Bryostatin-1 to treat this serious disease that every year becomes a larger and larger public health burden in the U.S. and around the world. Additional development, with a path to Phase 3, is clearly warranted.'

*'These results, which show improvement in patients with moderate to severe Alzheimer's disease, the population that is generally recognized as the most difficult to treat, provide exciting evidence of a new therapeutic approach potentially could rejuvenate synaptic networks in the brain.* Improvements across the range of important manifestations of the underlying neurodegenerative disease, as shown in this Phase 2 study, could potentially represent a shift in the paradigm to treat Alzheimer's disease,' said Dr. Daniel Alkon, President and Chief Scientific Officer of Neurotrope. 'I would also like to thank the National Cancer Institute for their generous donation of the Bryostatin-1 we have used in our clinical trials.'"

(Emphasis added.)

33.     Contrary to the affirmative representations made by Neurotrope that its Phase 2b trial achieved "positive results," the underlying trial data pertaining to the 20 microgram dose of Bryostatin failed to demonstrate statistical significance with regard to the primary endpoint of efficacy, even for those patients who completed the study. Moreover, Neurotrope purposefully and misleadingly omitted any data regarding the measurement of efficacy in patients taking the 40 microgram dose of Bryostatin.

34.     On this news, Neurotrope's share price fell $11.84, or 62.95%, to close at $6.97 on May 1, 2017, on heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Neurotrope securities during the Class Period (the "Class"); and were

damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Neurotrope securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Neurotrope or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Neurotrope;

- whether the Individual Defendants caused Neurotrope to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Neurotrope securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Neurotrope securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Neurotrope securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to,

and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Neurotrope securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Neurotrope securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Neurotrope securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Neurotrope's finances and business prospects.

48.    By virtue of their positions at Neurotrope, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Neurotrope, the Individual Defendants had knowledge of the details of Neurotrope's internal affairs.

50.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Neurotrope.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Neurotrope's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Neurotrope securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Neurotrope's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Neurotrope securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

51.     During the Class Period, Neurotrope securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Neurotrope securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Neurotrope securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Neurotrope securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of Neurotrope, and conducted and participated, directly and indirectly, in the conduct of Neurotrope's business affairs.  Because of their senior positions, they knew the adverse non-public information about Neurotrope's misstatement of income and expenses and false financial statements.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Neurotrope's financial condition and results of operations, and to correct promptly any public statements issued by Neurotrope which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Neurotrope disseminated in the marketplace during the Class Period concerning Neurotrope's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Neurotrope to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Neurotrope within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Neurotrope securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of Neurotrope.   By reason of their senior management positions and/or being directors of Neurotrope, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Neurotrope to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Neurotrope and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Neurotrope.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  June 8, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com
            hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*

**Submission Date**

2017-05-19 15:36:36

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against against Neurotrope, Inc., ("Neurotrope" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Neurotrope securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Neurotrope securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Neurotrope securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

# Name

**Print Name**

Daniel Hovasse

# Acquisitions

**Configurable list (if none enter none)**

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 3/29/2017 | 1685 | 19.25 |
| 4/06/2017 | 300 | 17.8897 |
| 4/24/2017 | 300 | 16.8 |
| 4/24/2017 | 515 | 17.7307 |

**Configurable list (if none enter none)**

| Date Sold | Number of Shares Sold | Price per Share Sold |
|-----------|----------------------|---------------------|
| 5/01/2017 | 2800 | 9.0736 |


(redacted)

**Full Name**

Daniel Hovasse


(redacted)

**NEUROTROPE, INC. (NTRP)**                                    **Hovasse, Daniel R.**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 3/29/2017 | Purchase | 1,685 | $19.2500 |
| 4/6/2017 | Purchase | 300 | $17.8897 |
| 4/24/2017 | Purchase | 515 | $17.7307 |
| 4/24/2017 | Purchase | 300 | $16.8000 |